[No. 1255-1.    Division One—Panel 1.    October 2, 1972.]

THE STATE OF WASHINGTON, *Respondent,* v. GARY CLAY, *Appellant.*

*James R. Short,* for appellant.

*Earl F. Angevine, Prosecuting Attorney,* and *Gilbert E. Mullen, Deputy,* for respondent.

CALLOW, J.—The defendant was tried and convicted of possession of a narcotic drug, count 1, under RCW

69.33.410, and possession of a dangerous drug, count 2, under RCW 69.40.061.

On December 30, 1970, officers of the Skagit County Sheriff's Department arrived at a residence at 7:30 a.m. to execute an arrest warrant for a person by the name of Latimer and a search warrant for the premises. When the officers arrived, the house was dark, and the shades were drawn. They were unaware that anyone was home. An officer knocked, announced his identity and purpose and entered the residence when he did not hear a response. Inside the house, they found the defendant and others asleep. A deputy sheriff testified that he awakened defendant and allowed him to put some clothes on. The defendant picked up a pair of pants, and the deputy searched them finding a packet of white powder and a wallet. The deputy testified he knew there was a wallet in the pants when he checked them, and he was watching the defendant closely and did not think the defendant could have put the wallet in the pants before he put them on. The bedroom was searched and other items found. A witness testified the defendant had said that he rented the house. A real estate salesman stated he had been contacted by the defendant and Latimer on November 27, 1970, regarding the residence, that he showed the place to them, that most of the conversation was with Clay, that they agreed to rent it, that no rental agreement was signed, and that the receipt was made out in Latimer's name. The salesman further testified he understood he was renting the house to Clay who planned on working nearby and going to school part time.

The defendant Clay assigns as error the denial of the motion to suppress, the denial of the challenge to the sufficiency of the evidence, the denial of the motion for mistrial, the denial of challenges for cause to two jurors, and the jury instruction relating to and defining actual and constructive possession. The defendant claims also that the equal protection clause of the fourteenth amendment to the

United States Constitution was violated by his being sentenced to the Department of Institutions.

Defendant claims that the fourth amendment to the Constitution of the United States regarding unreasonable searches and seizures has been violated. His position is that the affidavits in support of the warrant do not reflect that a violation of law was occurring at the time of the issuance of the warrant. The converse of this argument is that probable cause may not be based on stale information.

The dual requirements of *Aguilar v. Texas,* 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964), are reaffirmed with approval in *Spinelli v. United States,* 393 U.S. 410, 412, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969), wherein it was said:

> In *Aguilar,* a search warrant had issued upon an affidavit of police officers who swore only that they had "received reliable information from a credible person and do believe" that narcotics were being illegally stored on the described premises. While recognizing that the constitutional requirement of probable cause can be satisfied by hearsay information, this Court held the affidavit inadequate for two reasons. First, the application failed to set forth any of the "underlying circumstances" necessary to enable the magistrate independently to judge of the validity of the informant's conclusion that the narcotics were where he said they were. Second, the affiant-officers did not attempt to support their claim that their informant was " 'credible' or his information 'reliable.' "

*Spinelli* further recapped the standards for the testing of affidavits in support of a search warrant as follows at page 419:

> The affidavit, then, falls short of the standards set forth in *Aguilar, Draper* [*Draper v. United States,* 358 U.S. 307 (1959)], and our other decisions that give content to the notion of probable cause. In holding as we have done, we do not retreat from the established propositions that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, *Beck* v. *Ohio,* 379 U. S. 89, 96 (1964); that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, *McCray* v. *Illinois,* 386 U. S. 300, 311 (1967); that in

judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, *United States* v. *Ventresca,* 380 U. S. 102, 108 (1965); and that their determination of probable cause should be paid great deference by reviewing courts, *Jones* v. *United States,* 362 U. S. 257, 270-271 (1960). But we cannot sustain this warrant without diluting important safeguards that assure that the judgment of a disinterested judicial officer will interpose itself between the police and the citizenry.

(Footnotes omitted.)

*United States v. Harris,* 403 U.S. 573, 29 L. Ed. 2d 723, 91 S. Ct. 2075 (1971), quoted with approval *United States v. Ventresca,* 380 U.S. 102, 13 L. Ed. 2d 684, 85 S. Ct. 741 (1965), as follows:

"[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area.

Again in *Coolidge v. New Hampshire,* 403 U.S. 443, 449, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971), we find the United States Supreme Court reaching back with approval to a prior case setting standards in this area as follows:

The classic statement of the policy underlying the warrant requirement of the Fourth Amendment is that of Mr. Justice Jackson, writing for the Court in *Johnson* v. *United States,* 333 U. S. 10, 13-14:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any

assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent."

Thus, it is apparent that the exercise by the magistrate of his detached independent judgment must be pursuant to the guidelines of probable cause and that the magistrate must have the courage to refuse the issuance of a warrant if the guidelines are not met.

The Washington court has held that a signed affidavit for a search warrant is not required but may be given on affirmation. *State v. Malbeck,* 69 Wn.2d 695, 419 P.2d 805 (1966), said at page 697:

A signed affidavit for a search warrant is not required. The fourth amendment to the United States Constitution requires only that warrants issue upon probable cause supported by oath or affirmation. RCW 10.79.010 requires only that the application for a search warrant be under oath and that the justice find reasonable cause for the officer's belief.

The requirements of *Aguilar v. Texas, supra,* are the requirements reiterated in *State v. Walcott,* 72 Wn.2d 959, 435 P.2d 994 (1967), requiring (1) full disclosure to the magistrate of the underlying circumstances justifying issuance of the warrant and (2) justification of the credibility of the informant or the reliability of his information. Such also has been the recognition of *State v. Harrison,* 5 Wn. App. 454, 488 P.2d 532 (1971), wherein it was said at page 458:

To rise to the level of probable cause, the courts consider only probabilities, and a prima facie showing of criminal activity is not required. Affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial and,

in judging probable cause, issuing magistrates are not to be confined by restrictions on the use of good common sense. Their determination of probable cause should be paid great deference by reviewing courts. *Spinelli v. United States,* 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969); *State v. Barnes,* 76 Wn.2d 234, 456 P.2d 337 (1969). Probable cause exists where "the facts and circumstances within their [the arresting officers] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. *Carroll v. United States,* 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280, 288 (1925).

and also *State v. Hodge,* 5 Wn. App. 639, 641, 490 P.2d 126 (1971), where we find:

[A]ffidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, and issuing magistrates are not to be confined by restrictions on the use of their common sense.

With this background in mind, we turn to the challenge of the defendant. It is his position that for probable cause to exist for the issuance of the search warrant, it must exist at the time the warrant is issued. The information on which it is based may not be stale. This must be reflected in the affidavit submitted in support of the request for the warrant, and the affidavits in this case fall short of the constitutional minimum.

██ It is true that the affidavit or other showing must disclose facts showing an unlawful situation existing on the premises sought to be searched at the time of the showing and issuance of the warrant. *Sgro v. United States,* 287 U.S. 206, 77 L. Ed. 260, 53 S. Ct. 138, 85 A.L.R. 108 (1932); E. Fisher, *Search and Seizure* § 72 (1970). An affidavit submitted to the magistrate stated that the affiant believed that

A dangerous drug is by GARY CLAY being possessed or kept in violation of the provisions of Chapter 69.40.061 RCW; and also, . . . believes that the said goods, or a part thereof, are concealed in or about the person or property of Gary Clay . . .

Another affidavit stated that the affiant believed that the defendant Clay

has dangerous drugs in his possession for the following reasons: A reliable informant and undercover agent, who has given reliable information in the past which has lead to the arrest and conviction of persons involved with the possession and attempted sale of dangerous drugs, has advised me that on one occasion he has been in the Gary Clay residence, at a party where dangerous drugs were used. That the said Gary Clay has offered to sell dangerous drugs to said informant. That said informant has seen two (2) containers, one (1) containing marijuana and the other containing a mixture of dangerous drugs at the Gary Clay residence and has been advised by the said Gary Clay that these drugs are not for sale but are kept for the personal use of Gary Clay. That the Gary Clay residence is used as a storage place and distribution center for dangerous drugs in Skagit County.

The support for issuance of a search warrant is sufficient if, on reading the affidavits, an ordinary person would understand that a violation existed and was continuing at the time of the application. In *Waggener v. McCanless,* 183 Tenn. 258, 191 S.W.2d 551, 162 A.L.R. 1402 (1946), it was held that statements in the affidavit of "just recently" and "within the last few days" were sufficient to show present existence of probable cause for the issuance of a warrant. In *Borras v. State,* 229 So. 2d 244 (Fla. 1969), it was held that failure to recite a date or dates when marijuana was sold did not render it invalid where the wording used in the affidavit was in the present tense. *Commonwealth v. Misci,* 263 N.E.2d 445 (Mass. 1970), upheld an affidavit which recited that the information was current "this past week and at this time." *Sutton v. State,* 419 S.W.2d 857 (Tex. Crim. App. 1967), upheld the use of the word "recently" with other references to time as sufficient, definite and current to warrant conclusion that the act or event relied on as the basis for probable cause occurred within a reasonable time before making the affidavit.

The California rule was enunciated in *People v. Nelson,* 171 Cal. App. 2d 356, 340 P.2d 718 (1959), wherein it was

held that representations, in the present tense, that the offense was being committed and that on observation of the affiant "marijuana is being kept and smoked" was sufficient and appropriate. The philosophy was followed in *People v. Scott*, 259 Cal. App. 2d 268, 66 Cal. Rptr. 257 (1968).

The rationale of the cases is one of common sense; and if it can be said from the face of the affidavit that the information received by the affiant was recent and contemporaneous, this refutes that the affidavit reflects stale information and probable cause is shown. *Rugendorf v. United States*, 376 U.S. 528, 11 L. Ed. 2d 887, 84 S. Ct. 825 (1964); *Coyne v. Watson*, 392 F.2d 585 (6th Cir. 1968); *Reynolds v. State*, 46 Ala. App. 77, 238 So. 2d 557 (1970); Annot., 100 A.L.R.2d 525 (1965); 47 Am. Jur. *Searches and Seizures* § 23 (1942).

The search and seizure under the warrant issued was reasonable, and the trial court acted properly in not suppressing the evidence.

The defendant now turns us to an examination of whether there was sufficient and substantial evidence to show possession of the narcotic drug. *State v. Werry*, 6 Wn. App. 540, 494 P.2d 1002 (1972), defined actual and constructive possession at page 547:

> Possession of narcotic drugs may be either actual or constructive. Actual possession is proved when the drugs are found to be in the actual, physical custody of the person charged with possession. Constructive possession is proved when the person charged with possession has dominion and control over either the drugs or the premises upon which the drugs were found. *State v. Callahan*, 77 Wn.2d 27, 459 P.2d 400 (1969).
>
> Once possession of a narcotic drug has been established, the burden shifts to the defendant to explain away the possession as unwitting, lawful or otherwise excusable. *State v. Morris*, 70 Wn.2d 27, 422 P.2d 27 (1966).

There was evidence of actual possession in that the jury could believe that the drug found in the defendant's clothing belonged to him. The jury could also believe that the pants which he put on when he was arrested were his,

that the wallet in those pants belonged to him and identified that article of clothing as his, and that the drug which came out of the pocket in those pants was his. This evidence is actual direct connection of the drug to the defendant. In *State v. Turner*, 4 Wn. App. 448, 449, 481 P.2d 906 (1971), we find:

> The basis of defendant's argument is that under the standard of *State v. Callahan*, 77 Wn.2d 27, 459 P.2d 400 (1969), he did not have *constructive* possession of the narcotic, but what defendant fails to recognize is that there is direct evidence in this case of actual possession of heroin by the defendant. *Callahan* does not support defendant's contention. It involved a question of constructive possession where the evidence of dominion and control was purely circumstantial which was countered by undisputed direct evidence placing exclusive possession in another person.
>
> Here there is substantial evidence of *actual*, rather than *constructive*, possession established by *direct*, rather than *circumstantial*, evidence.

Our conclusion is also supported by *State v. Emerson*, 5 Wn. App. 630, 489 P.2d 1138 (1971).

■ Likewise, the circumstantial evidence is sufficient and substantial to support constructive possession. The jury could believe the defendant was a tenant or cotenant of the home, paid the rent or at least a part thereof and had dominion and control over the premises and over the drugs found in the room in which he was sleeping. These circumstances if believed by the jury are sufficient to establish beyond a reasonable doubt that the defendant had constructive possession of the drug. *State v. Edwards*, 5 Wn. App. 852, 490 P.2d 1337 (1971); *State v. Tretton*, 1 Wn. App. 607, 464 P.2d 438 (1969); *State v. Potts*, 1 Wn. App. 614, 464 P.2d 742 (1969).

■ On the showing made, it became the burden of the defendant to show that his possession of the drug was either unwitting or was authorized. *State v. Morris*, 70 Wn.2d 27, 422 P.2d 27 (1966); *State v. Werry, supra*. The defendant did not carry that burden. *See* 46 Wash. L. Rev. 555 (1971).

The jury was not sequestered during the course of trial. Following recess over a weekend, an article appeared in a local newspaper which discussed arguments held in the absence of the jury concerning the defendant's ownership of three handguns found in the house where he was arrested. Further, this point was broadcast over a local radio station specifically reiterating the material discussed in the newspaper. The trial court had excluded any testimony concerning these guns. Defense counsel moved for mistrial and requested that each member of the jury be asked whether he had read the newspaper account and, if so, what influence it might have had on the juror's objectivity. The trial court stated it had admonished the jury at the beginning of the trial not to read about the case, discuss it, or listen to radio accounts on its progress and had done so again from time to time during the trial. Defense counsel acknowledges this was done though the statement of facts does not set out any admonishments whatsoever. The defendant asserts that the refusal to poll the jury was erroneous.

The approved draft of the ABA standards relating to *Fair Trial and Free Press* § 3.5(f) (1968), contains the following on conduct of the trial:

> Questioning jurors about exposure to potentially prejudicial material in the course of the trial; standard for excusing a juror.
>
> If it is determined that material disseminated during the trial goes beyond the record on which the case is to be submitted to the jury and raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material. The examination shall take place in the presence of counsel, and an accurate record of the examination shall be kept. The standard for excusing a juror who is challenged on the basis of such exposure shall be the same as the standard of acceptability recommended in section 3.4 (b)[1], . . . except that a juror who has

---

[1] (b) Standard of acceptability.

"Both the degree of exposure and the prospective juror's testimony as to his state of mind are relevant to the determination of acceptability. A prospective juror who states that he will be unable to overcome

seen or heard reports of potentially prejudicial material shall be excused if reference to the material in question at the trial itself would have required a mistrial to be declared.

The comment on this rule makes it clear that it is directed at extrajudicial statements going beyond the record on which the case is to be submitted to the jury, including reports of arguments outside the presence of the jury. The rule also makes it explicit that the examination of jurors with respect to exposure to outside information should take place in the presence of counsel and an accurate record of the examination kept for purposes of review. Likewise, the standard was established that a juror should be excused if reference to the material in question, at the trial itself, would have required a mistrial.

The *State Trial Judge's Book,* ch. 22, p. 274 (2d ed. 1969), contains the following language:

5. Questioning Jurors about Publicity Occuring During Trial

When it comes to the court's attention that material which goes beyond the evidence presented to the jury and which may seriously disturb its impartiality may have reached some or all of the jurors, the court should question each such juror, separately, and out of the presence of any other jurors, about his exposure to the material. Such an inquiry should be made on motion of the state, of the accused or on the court's own motion. The state has the burden, with respect to publicity from

his preconceptions shall be subject to challenge for cause no matter how slight his exposure. If he has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his judgment will be affected, his acceptability shall turn on whether his testimony as to impartiality is believed. If he admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial. A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to his testimony as to his state of mind."

which prejudice might arise, of showing that defendant's rights have not been prejudiced. Moreover, since the state has that burden, the fact that defendant declines the court's offer to question the jurors concerning the publicity does not, it appears, obviate the necessity for the inquiry. While the inquiry should be conducted by the trial judge, and should be held in camera to assure frankness on the part of the juror in answering questions and to prevent further prejudice to defendant through media reports of the questioning, counsel must be permitted to be present and to suggest lines of inquiry to the judge if they so desire. A verbatim transcript must be kept for purposes of appeal. The basis for excusing a juror who has been exposed to such publicity is the same as the standard of acceptability with respect to opinions formed on the basis of pretrial publicity, except that if the publicity is such that a mistrial would have to be declared if it had been referred to during trial, a juror who has seen or heard it should be excused. In proceeding on its own motion or ruling on a motion by the state, the court should, however, bear in mind that if the excusal of jurors reduces the number of jurors to less than twelve a mistrial must be declared (absent defendant's consent to a jury of less than twelve). A mistrial at that stage, without defendant's active or express consent, unless unequivocally in defendant's interest, may on the principle of double jeopardy, preclude a retrial.

(Footnotes omitted.)

The basic standards were discussed in *Sheppard v. Maxwell,* 384 U.S. 333, 350, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966):

But the Court has also pointed out that "[l]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges* v. *California* [314 U.S. 252, 265 (1941)], at 271. And the Court has insisted that no one be punished for a crime without "a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and.tyrannical power," *Chambers* v. *Florida,* 309 U. S. 227, 236-237 (1940). "Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice." *Pennekamp* v. *Florida,* 328 U. S. 331, 347 (1946). But it must

not be allowed to divert the trial from the "very purpose of a court system . . . to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures." *Cox* v. *Louisiana*, 379 U. S. 559, 583 (1965) (Black, J., dissenting). Among these "legal procedures" is the requirement that the jury's verdict be based on evidence received in open court, not from outside sources. Thus, in *Marshall* v. *United States*, 360 U. S. 310 (1959), we set aside a federal conviction where the jurors were exposed "through news accounts" to information that was not admitted at trial. We held that the prejudice from such material "may indeed be greater" than when it is part of the prosecution's evidence "for it is then not tempered by protective procedures." At 313. . . .

. . .

The undeviating rule of this Court was expressed by Mr. Justice Holmes over half a century ago in *Patterson* v. *Colorado*, 205 U. S. 454, 462 (1907):

"The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."

Specifically, the *Sheppard* case pointed out that where possible prejudicial material may have reached a jury during trial proceedings, it is appropriate for the trial court to inquire of the jury as to the extent of their exposure to the inadmissible material. The court stated at page 357:

Despite the extent and nature of the publicity to which the jury was exposed during trial, the judge refused defense counsel's other requests that the jurors be asked whether they had read or heard specific prejudicial comment about the case, including the incidents we have previously summarized. In these circumstances, we can assume that some of this material reached members of the jury. See *Commonwealth* v. *Crehan*, 345 Mass. 609, 188 N. E. 2d 923 (1963).

We agree with ABA standards relating to *Fair Trial and Free Press* (1968), which requires the trial judge to ascertain whether jurors have been exposed to prejudicial outside influences. We agree that when such exposure is

discovered, the trial judge must correct the prejudice, if it can be corrected; and, if not, a mistrial must be granted. *United States v. Agueci*, 310 F.2d 817 (2d Cir. 1962); *United States v. Howell*, 240 F.2d 149 (3d Cir. 1956); *Smith v. United States*, 236 F.2d 260 (8th Cir. 1956); *Krogmann v. United States*, 225 F.2d 220 (6th Cir. 1955); *Briggs v. United States*, 221 F.2d 636 (6th Cir. 1955); *United States v. Powell*, 171 F. Supp. 202 (N.D. Cal. 1959).

The problem is not entirely new to our state. In *State v. Claypool*, 135 Wash. 295, 237 P. 730 (1925), jurors read newspaper articles concerning rulings of the trial court on evidence not admitted; and despite the answers of the jurors polled that the articles would not influence them, a new trial was granted.

Here the jury was not polled so we have no knowledge of whether they had taken note of the prejudicial material or not. Therefore, we are unable to ascertain whether the defendant received a fair trial or whether the verdict was the result of prejudice implanted in their minds by the publicity during the course of the trial.

In *Silverthorne v. United States*, 400 F.2d 627 (9th Cir. 1968), a conviction was reversed, and the cause remanded for a new trial. The court stated at page 640:

Relative to the publicity contemporary with the trial of the case, appellant made motions for (1) mistrial; (2) to interrogate the jurors as to the effect of the publicity on each of them; and (3) to prohibit the jurors from taking newspapers into the jury room. The motions were denied each time they were made.

The court also stated at page 642:

The trial court should not have denied the motion for a mistrial without having first ascertained, by questioning the jurors, that they had not read an article about the defendant in the San Francisco Chronicle of January 27, 1966, or, if any of them had read it, that they were not influenced thereby. . . .

. . .

Jurors are not presumed to separate the truth from the falsity in newspaper articles concerning the trial in

which they sit as judges of fact. The jury's impartiality must be kept free from "any outside influence, whether of private talk or public print." . . . It is therefore the affirmative duty of the trial court to take positive action to ascertain the existence of improper influences on the jurors' deliberative qualifications and to take whatever steps are necessary to diminish or eradicate such improprieties. . . .

. . .

Despite the inability of the trial judge to prevent newspapers or other news media from being brought to the attention of a non-sequestered jury alleging evidence of misconduct of the defendant not offered against him at the trial, the trial court cannot assume that all is well, or that there is nothing he can do. He is required to assume, until he has established otherwise by voir dire examination, "that some of this material reached the members of the jury." . . .

We think that in view of the nature of some of the newspaper publicity unfavorable to the appellant, the trial court should have interrogated the jury, in camera, when requested to do so by defense counsel.

Without reaching the other points raised by appellant Silverthorne, we feel required to hold that he did not receive a fair trial; that the probability of prejudice arose and was not eliminated. Sheppard v. Maxwell, supra; Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).

(Citations omitted.)

Juries may be exposed to outside publicity during trial without it influencing their deliberations. A mistrial would be inappropriate in such a situation, and the trial judge should be free to evaluate the circumstances and grant or deny a mistrial in the exercise of an enlightened discretion. *See generally People v. Lambright,* 61 Cal. 2d 482, 393 P.2d 409, 39 Cal. Rptr. 209 (1964); *Myers v. Harter,* 76 Wn.2d 772, 459 P.2d 25 (1969); *State v. Stevens,* 26 Wis. 2d 451, 132 N.W.2d 502 (1965). However, he must ascertain whether the outside publicity has prejudiced the jury when requested to do so by defense counsel. *See also State v. O'Donnell,* 280 Minn. 213, 158 N.W.2d 699 (1968); *Crowe v. State,* 84 Nev. 358, 441 P.2d 90 (1968), *disapproved on other*

*grounds*, in *Tellis v. State*, 84 Nev. 587, 445 P.2d 938 (1968); *State v. Lagerquist*, 256 S.C. 69, 180 S.E.2d 882 (1971). Where ABA standards relating to *Fair Trial and Free Press* § 3.5(f) (1968) is at odds with the format set forth in *The State Trial Judge's Book*, ch. 22 (2d ed. 1969), the ABA standards relating to *Fair Trial and Free Press* sets forth the preferable approach, and it should not be mandatory that the trial judge poll the jury where defense counsel does not request it. Further, we note that the federal approach diverges from the course set by some states. *People v. Marino*, 95 Ill. App. 2d 369, 238 N.E.2d 245 (1968). We adopt the federal rationale as reflected in ABA standards relating to *Fair Trial and Free Press* § 3.5(f) (1968).

When the jury was exposed to possibly prejudicial outside publicity and a poll of the jury was requested by the defense, it was proper to follow the ABA standards relating to *Fair Trial and Free Press* § 3.5(f) (1968), and error to disregard the request.

We have discussed those assignments of error that will arise upon a new trial and have not considered those questions of law unlikely to arise again. Canon of Judicial Ethics 19.

The judgment is reversed, and the cause is remanded for a new trial. *See Rideau v. Louisiana*, 373 U.S. 723, 10 L. Ed. 2d 663, 83 S. Ct. 1417 (1963); *Irvin v. Dowd*, 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961); *Marshall v. United States*, 360 U.S. 310, 3 L. Ed. 2d 1250, 79 S. Ct. 1171 (1959).

HOROWITZ, C.J., and WILLIAMS, J., concur.

Petition for rehearing denied January 26, 1973.

Review denied by Supreme Court March 6, 1973.